| | |
|---|---|
| E.T., a minor, by his parents, JANE DOE and JOHN DOE, and on their own behalf, <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF SPECIAL EDUCATION APPEALS OF THE DIVISION OF ADMINISTRATIVE LAW APPEALS, MASSACHUSETTS DEPARTMENT OF ELEMENTARY EDUCATION; ANDOVER SCHOOL DISTRICT; PATRICK BUCCO, individually and in his capacity as Principal of Wood Hill Middle School; LINDA CROTEAU, individually and in her capacity as former Special Ed Program Head for Wood Hill Middle School; MARINEL MCGRATH, Superintendent, in her official capacity; and ANNIE GILBERT, School Committee Chair, in her official capacity, <br><br> Defendants. | Civil Action No. <br> 14-11892-FDS |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION TO DISMISS COUNTS TWO THROUGH FOUR

**SAYLOR, J.**

This is an appeal of an administrative decision by the Bureau of Special Education Appeals ("BSEA") denying tuition reimbursement for a disabled student. Plaintiffs E.T. and his parents, proceeding under the pseudonyms Jane Doe and John Doe, have brought suit against defendants BSEA, Massachusetts Department of Elementary Education, and Andover School

District and various school administrators.

On June 16, 2014, plaintiffs amended the complaint to add three counts based on alleged civil rights violations arising from the seizure by the school of notebooks belonging to E.T. that contained comic drawings. Defendants have moved to dismiss Counts Two through Four of the amended complaint. For the following reasons, the motion will be granted in part and denied in part.

## I.     The Statutory Framework

The Individuals with Disabilities Education Act ("IDEA") conditions the provision of federal funds to state schools on compliance with a requirement to provide all disabled children with a "free appropriate public education" ("FAPE"). *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 987 (1st Cir. 1990) (quoting 20 U.S.C. §§ 1400(c), 1414(b)(2)(A), 1416)). "Substantively, the 'free appropriate public education' ordained by the Act requires participating states to provide, at public expense, instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'" *Id.* (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 203 (1982)).

### A.     Individualized Education Programs

The IEP is the statute's primary safeguard for assuring the provision of FAPE to disabled children. IEPs are formulated through the participation of a team that includes the student's parents, at least one of the student's regular education teachers (if any), at least one special education teacher, a representative of the local education agency, and an individual who can interpret the instructional implications of evaluation results. *North Reading Sch. Comm. v. BSEA*, 480 F. Supp. 2d 479, 482 n.5 (D. Mass. 2007). "Each IEP must include an assessment of

the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005); *see Roland M.*, 910 F.2d at 987 (citing 20 U.S.C. § 1401(19); 34 C.F.R. § 300.346).

> There is no mechanical checklist by which an inquiring court can determine the proper content of an IEP; IEPs are by their very nature idiosyncratic. One thing is clear: the substance of an IEP must be something different than the normal school curriculum and something more than a generic, one-size-fits-all program for children with special needs.

*Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008) (citations omitted) (internal quotation marks omitted). IEPs must be reviewed annually and revised when necessary. *Roland M.*, 910 F.2d at 988.

### B. **Appropriateness and Adequacy**

The IDEA requires an "appropriate" education and an adequate IEP; it does not require perfection.

> The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation. It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

*Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993) (citing *Rowley*, 458 U.S. at 198; *Roland M.*, 910 F.2d at 992).[1]

> A school system has met this obligation as long as the program that it offers to a disabled student is 'reasonably calculated' to deliver 'educational benefits.' At

---

[1] Massachusetts had previously adhered to the higher standard of "maximum possible development" before adopting the federal standard of "free appropriate public education," effective January 1, 2002. *See* Mass. Gen. Laws ch. 71B; *Wanham v. Everett Pub. Schs*, 550 F. Supp. 2d 152, 157 (D. Mass. 2008).

3

bottom, this obligation is an obligation to provide an adequate and appropriate education. The IDEA does not place school systems under a compulsion to afford a disabled child an ideal or an optimal education.

*C.G. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 284 (1st Cir. 2008) (citations omitted).

### C.     Least Restrictive Environment

"The IDEA . . . articulates a preference for mainstreaming," that is, educating disabled students with non-disabled students as much as possible. *Lenn*, 998 F.2d at 1086 (citing 20 U.S.C. § 1412(5) (requiring states to educate disabled and non-disabled children together "to the maximum extent appropriate")). "Translated into practical application, this preference signifies that a student 'who would make educational progress in a day program' is not entitled to a residential placement even if the latter 'would more nearly enable the child to reach his or her full potential.'" *Id.* (quoting *Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir. 1983)).

### D.     Administrative Hearings

Should the parents of a disabled child wish to contest an IEP, the state is required to convene an impartial hearing. 20 U.S.C. § 1415(f)(1)(A). In Massachusetts, these hearings are conducted by the BSEA in accordance with rules that it has promulgated pursuant to Massachusetts law. Mass. Gen. Laws ch. 71B § 3; 603 Mass. Code Regs. 28.08(5)(a); *see Roland M.*, 910 F.2d at 988. Under Massachusetts law, the BSEA has jurisdiction to hear disputes

> between and among parents, school districts, private schools and state agencies concerning: (i) any matter relating to the identification, evaluation, education program or educational placement of a child with a disability or the provision of a free and appropriate public education to the child arising under this chapter and regulations promulgated hereunder or under the Individuals with Disabilities Act, 20 U.S.C. section 1400 et seq., and its regulations; or (ii) a student's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. section 794, and its regulations.

4

Mass. Gen. Laws. Ch. 71B § 2A(a). The decision of the BSEA is reviewable in either state or federal court, and the reviewing tribunal has broad discretion to grant such relief it determines is appropriate. 20 U.S.C. § 1415(i)(2)(A), (i)(2)(C)(iii); *Roland M.*, 910 F.2d at 987-88. However, before such an action is brought, the party seeking review must exhaust all administrative procedures under the IDEA. 20 U.S.C. § 1415(l).

## II. Background

### A. Factual Background

Unless otherwise noted, the facts are presented as stated in the amended complaint.

E.T. is a 17-year-old "highly intelligent" student with Asperger's Syndrome. (Am. Compl. ¶¶ 1, 11-12). From 2009 to 2012, he attended Wood Hill Middle School in the Andover School District. (*Id.* ¶¶ 1, 14). During that time, he operated under an IEP. (*Id.* ¶¶ 1, 14). According to the complaint, the Andover School District was obligated to provide E.T. with special-education services under the IDEA. (*Id.* ¶¶ 1, 4, 6).

Patrick Bucco is the principal of Wood Hill Middle School. (*Id.* ¶ 7). Linda Croteau is currently the assistant principal of the middle school. (*Id.* ¶ 8). From 2009 to 2012, Croteau served as the head of the special-education program at the school. (*Id.* ¶ 8). The complaint alleges that Bucco and Croteau are responsible for ensuring that the school does not discriminate against disabled students. (*Id.* ¶¶ 7-8). Marinel McGrath is the Superintendent of the Andover School District, and Annie Gilbert is the chairperson of the school committee for the School District. (*Id.* ¶¶ 9-10).

The complaint alleges that the School District and E.T.'s parents disagreed over his educational plan, and that E.T. was "frequently subjected to arbitrary discipline including

unjustifiable and prolonged suspensions and unnecessary, unconstructive restrictions, which made him feel stigmatized, alienated, and oppressed." (*Id.* ¶¶ 1, 15, 17). It alleges that in 2009, the Wood Hill Middle School requested that E.T.'s parents remove him from the school and place him in an out-of-district private school. (*Id.* ¶¶ 1, 19). It further alleges that the School District attempted to "coerce and pressure" E.T. and his parents to switch schools by intentionally making "E.T.'s life at school restricted, humiliating, and depressing." (*Id.*. ¶ 1). It alleges that E.T. was interviewed by an armed police officer for two to three hours without parental consent in November 2009, that he was forced to undergo a 45-day assessment at the North Shore Education Consortium's North Shore Academy in 2010, and that he was suspended for more than ten days in January 2012. (*Id.* ¶¶ 18, 20, 27).

In March and May 2012, E.T. had notebooks containing comic drawings confiscated and searched by the school. (*Id.* ¶ 29). On March 21, 2012, Bucco "asked E.T. for his comic drawing books, saying that he would like to understand E.T.'s work and would return it to him after." (*Id.* ¶ 78). E.T. "reluctantly" gave Bucco the book. (*Id.*). The complaint alleges that Bucco gave the drawings to the Andover School District's attorney "without obtaining E.T.'s or Parents' consent." (*Id.* ¶ 83). It also alleges that Wood Hill Middle School "arbitrarily subjected E.T. to suspensions without due process simply because there were some swords and guns and other character descriptions, which was common in some comic stories, in E.T.'s comic drawings." (*Id.* ¶ 84).

On May 25, 2012, E.T. brought another drawing book with comics to school. (*Id.* ¶ 85). A teacher noticed it and demanded that E.T. turn it over to her. (*Id.* ¶ 86). He refused. (*Id.*). As a result, he was sent to the school office, where Croteau "demanded that [he] give her his

6

drawing book and threatened him with a suspension if he would not comply." (*Id.* ¶ 87). The complaint alleges that E.T. began crying and told Croteau that he would rather die than turn over the book. (*Id.* ¶ 88). It alleges that "Croteau persisted with a complete disregard of E.T.'s mental state, and called in the school security officer to examine E.T.'s drawing book against his will. And the Officer did examine the drawing book and found nothing of concern." (*Id.* ¶ 89). The May 25 incident concluded with Croteau making copies of the images in the book before returning it to E.T. (*Id.* ¶ 90).

In 2012, the school initiated a formal proceeding to move E.T. from the Andover School District to a "private school with 'a small educational environment.'" (*Id.* ¶¶ 1, 30). His parents disagreed with the School District and wanted him to attend high school in Andover "with the support of a doctor-recommended behavior intervention plan." (*Id.* ¶¶ 1, 31). On April 12, 2012, the School District filed a hearing request before the BSEA after E.T.'s parents rejected placement at the Gifford School. (*Id.* ¶¶ 1, 30). In August 2012, the BSEA conducted a three-day evidentiary hearing to determine whether E.T. should be placed outside the School District. (*Id.* ¶¶ 1, 37).

The complaint alleges that prior to the BSEA's decision, the School District offered to pay $11,275 per year for E.T.'s tuition at a private school of his parents' choosing. (*Id.* ¶¶ 1, 38). In September 2012, E.T.'s parents enrolled him as a freshman in high school at the Presentation of Mary Academy, a private school that did not offer special-education services. (*Id.* ¶¶ 1, 39). The complaint alleges that E.T.'s parents notified the School District before enrolling E.T. in the Academy, and that the School District communicated verbally and in writing of its intent "to enter into a written agreement . . . to pay for E.T.'s education" at the

7

Academy. (*Id.* ¶¶ 1, 40).

On September 11, 2012, one week after E.T. was enrolled in the Academy, the BSEA ruled that "Andover Public Schools shall locate or create a placement for highly intelligent students with Asperger's Syndrome or similar disorders, and shall fund Student's placement in such program." (*Id.* ¶¶ 1, 42-43). The BSEA made its ruling on the basis of various findings of fact, including some that related to E.T.'s comic drawings. (BSEA Decision #12-7315, Sept. 11, 2012). Both E.T.'s parents and the School District appealed the BSEA's decision to the United States District Court. (Am. Compl. ¶¶ 1, 45). On November 21, 2013, Judge Douglas P. Woodlock upheld the BSEA's decision. (*Id.* ¶¶ 1, 47).

According to the complaint, prior to the BSEA's decision, the School District "retracted its offer to pay for E.T.'s education" at the Presentation of Mary Academy. (*Id.* ¶¶ 1, 41). On October 1, 2013, E.T.'s parents filed a request for a BSEA hearing, seeking an order for the Andover School Board to reimburse E.T.'s private school tuition. (*Id.* ¶¶ 1, 46). In December 2013, the BSEA held a two-day hearing on the reimbursement issue. (*Id.* ¶ 1). On January 21, 2014, the BSEA denied the parents' request for tuition reimbursement. (Am. Compl. ¶¶ 1, 58).

### B.     Procedural Background

On April 18, 2014, plaintiffs filed a one-count complaint in this action, containing an administrative appeal of the BSEA ruling that denied plaintiffs' request for tuition reimbursement. The complaint was amended on June 16, 2014, to add three additional claims: (1) a section 1983 claim for an illegal search and seizure in violation of the Fourth Amendment; (2) a section 1983 claim for violation of free speech rights under the First Amendment; and (3) a state law claim for invasion of privacy. The three newly added claims all arise out of the seizure

8

and subsequent use of the notebooks with comic drawings in March and May 2012.

On August 6, 2014, defendants moved to dismiss the newly added counts. They contend that those claims should be dismissed because (1) the claims are barred by the doctrine of claim preclusion; (2) plaintiffs failed to exhaust their administrative remedies as to those claims; and (3) certain of the claims fail to state a claim upon which relief can be granted.

### III.    Standard of Review

#### A.    Motion To Dismiss Under Fed. R. Civ. P. 12(b)(6)

On a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the facts as alleged do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (alterations omitted) (internal quotation marks omitted).

#### B.    Motion To Dismiss Under Fed. R. Civ. P. 12(b)(1)

Pursuant to Fed R. Civ. P. 12(b)(1), a defendant may move to dismiss an action based on

9

lack of federal subject-matter jurisdiction. Because federal courts are considered courts of limited jurisdiction, "[t]he existence of subject-matter jurisdiction 'is never presumed.'" *Fafel v. Dipaola*, 399 F.3d 403, 410 (1st Cir. 2005) (quoting *Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir. 1998)). Rather, "'the party invoking the jurisdiction of a federal court carries the burden of proving its existence.'" *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (quoting *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993)). Once a defendant challenges the jurisdictional basis for a claim under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction. *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007).

When ruling on a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the district court "must credit the plaintiff's well-[pleaded] factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010). "The district court may also 'consider whatever evidence has been submitted, such as the depositions and exhibits submitted.'" *Id.* (quoting *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir. 1996)).

## IV. Analysis

### A. Claim Preclusion

Counts Two through Four allege claims concerning the seizure and subsequent use of E.T.'s drawings. The content of the drawings was directly relevant to E.T.'s educational placement, which was the subject of the BSEA's September 11, 2012 decision. Defendants contend that plaintiffs could have, and should have, raised any claims concerning the seizure in the first BSEA proceeding and the subsequent appeal, and that therefore the claims are barred by

10

the doctrine of claim preclusion.

The doctrine of claim preclusion, or *res judicata*, prohibits parties from contesting issues that they have had a "full and fair opportunity to litigate." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Claim preclusion requires proof of three elements: "(1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related." *Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 14 (1st Cir. 2010).

The first and third elements are easily satisfied, and will be addressed first.

### 1. Prior Final Judgment on the Merits

The first element of claim preclusion is that the earlier suit must have resulted in a final judgment on the merits. *Airframe*, 601 F.3d at 14. Here, the BSEA's first decision has been fully and finally litigated. The BSEA issued its decision on September 11, 2012, and the decision was upheld on appeal to the District Court. The first element is therefore satisfied.

### 2. The Parties in the Two Suits Are Sufficiently Identical or Closely Related

The third element of claim preclusion is that the parties in the suits must be sufficiently identical or closely related. *Airframe*, 601 F.3d at 14. Here, the parties in the two causes of action are identical. The third element is therefore satisfied.

### 3. Identical or Related Claims

The second element of claim preclusion is that the claims asserted in the earlier and later suits must be sufficiently identical or related. *Airframe*, 601 F.3d at 14. If the two claims are "founded upon the same transaction, [arise] out of the same nucleus of operative facts, and [seek] redress for essentially the same basic wrong," the claims are sufficiently identical or related.

11

*Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1166 (1st Cir. 1991). "[T]he mere fact that different legal theories are presented in each case does not mean that the same transaction is not behind each." *Porn v. National Grange Mut. Ins. Co.*, 93 F.3d 31, 34 (1st Cir. 1996) (internal quotation marks omitted). "When the process mandated by the IDEA produces an administrative decision that is upheld on judicial review, 'principles of issue and claim preclusion may properly be applied to short-circuit redundant claims under other laws.'" *Miller ex. rel. S.M. v. Board of Educ. of Albuquerque Pub. Sch.*, 455 F. Supp. 2d 1286, 1313 (D.N.M. 2006) (quoting *Independent Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir. 1996)), *aff'd*, 565 F.3d 1232 (10th Cir. 2009).

Here, the BSEA made its September 11, 2012, ruling on the basis of various findings of fact, including some that related to E.T.'s drawings. (BSEA Decision #12-7315, Sept. 11, 2012). Defendants contend that there is no reason that plaintiffs could not have raised the claims in the first administrative proceeding and first federal appeal.

As noted, the BSEA only has jurisdiction to hear disputes concerning

> (i) any matter relating to the identification, evaluation, education program or educational placement of a child with a disability or the provision of a free and appropriate public education to the child arising under this chapter and regulations promulgated hereunder or under the Individuals with Disabilities Act . . . ; or (ii) a student's rights under Section 504 of the Rehabilitation Act of 1973 . . . .

Mass. Gen. Laws Ch. 71B § 2A(a). Plaintiffs are not precluded from bringing any of their claims to the extent that the BSEA did not have jurisdiction to hear them in the prior proceeding. The issue, therefore, is whether the BSEA had jurisdiction to consider those claims.

Counts Two through Four assert claims for unreasonable search and seizure under the Fourth Amendment, violation of free speech rights under the First Amendment, discrimination

12

under section 504 of the Rehabilitation Act, deprivation of rights to due process and equal protection under the Fourteenth Amendment, and invasion of privacy under state law. Some of the language in those counts suggests that plaintiffs are challenging E.T.'s suspension from school, the use of the comic drawings in the prior proceedings, or discrimination based on E.T's disability. To the extent that is true, plaintiffs could have brought those claims during the first BSEA hearing. *See Independent School Dist. No. 283, St. Louis Park, Minn. v. S.D. by and through J.D.*, 948 F. Supp. 860, 889 (D. Minn. 1995) ("Congress has left no doubt as to its intention to allow such claims to proceed in tandem with an [Individuals with Disabilities Education Act] claim."), *aff'd*, 88 F.3d 556 (8th Cir. 1996); *see also Hayes through Hayes v. Unified School Dist. No. 377*, 877 F.2d 809 (10th Cir. 1989) (finding that matters of discipline, including short-term suspensions fall within the scope of FAPE issues). If plaintiffs were to succeed as to any of those claims, they would presumably seek damages resulting from the suspension, the BSEA ruling, or any other educational consequence that flowed from those events. Such an award of damages would effectively revisit the BSEA's ruling, and entirely undermine it. *Cf. Heck v. Humphreys*, 512 U.S. 477, 486-87 (1994) (explaining that a prisoner cannot assert a civil rights cause of action and seek damages for an allegedly unconstitutional conviction because the success of the suit would effectively invalidate the prisoner's underlying conviction and sentence).

However, plaintiffs also appear to seek damages for claimed injuries that are separate from the suspension and the BSEA decision. To the extent that plaintiffs seek damages for "humiliation, "pain and suffering," and "damage to . . . emotional well[-]being" separate from education-related issues, those claims are independent claims that do not arise under the IDEA.

*See Hough v. Shakopee Public Schools*, 608 F. Supp. 2d 1087, 1109-10 (D. Minn. 2009) (holding that "the mere fact that plaintiffs are disabled and receive special-education services does not transform their Fourth Amendment challenge" based on a school's illegal search policy "into an IDEA-type claim").[2] The core of those claims is not that E.T. was denied a FAPE, but rather that he suffered emotional distress from the unlawful seizure of his property. *Id.* An award of damages on those claims would compensate plaintiffs for those injuries resulting from the alleged constitutional and state law violations, and not for those injuries arising out of any educational harm. *See Hough*, 608 F. Supp. 2d at 1109-10; *see also M.Y. ex rel. J.Y. v. Special School Dist. No. 1*, 519 F. Supp. 2d 995, 1002-03 (D. Minn. 2007) (finding that plaintiff was not required to exhaust her administrative remedies under the IDEA where she sought damages to redress injuries resulting from an alleged sexual assault, not from the deprivation of special education transportation). As a result, "the effect of the searches on [his] education [is] peripheral . . . ." *Hough*, 608 F. Supp. 2d at 1109-10. And a ruling in plaintiffs' favor on those claims would not undermine the prior BSEA ruling. *Cf. Heck* 512 U.S. at 487 (explaining that if a ruling in favor of the plaintiff "will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed").

Accordingly, to the extent that the claims in Counts Two through Four seek damages or other relief based on the educational consequences of the seizure, such as his suspension and school placement, they are barred by the doctrine of issue preclusion. To the extent that those

---

[2] Claims for emotional-distress type damages are cognizable under section 1983. *See Carey v. Piphus*, 435 U.S. 247, 264 n.22 (1978) (explaining that "courts have indicated that damages may be awarded for humiliation and distress caused by unlawful arrests, searches, and seizures"); *see also Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (recognizing that section 1983 compensatory damages "may include not only out-of-pocket loss and other monetary harms, but also such injuries as "impairment of reputation . . . , personal humiliation, and mental anguish and suffering").

claims seek emotional-distress damages arising out of the alleged unlawful seizure and First Amendment violation themselves, the BSEA did not have jurisdiction to hear them, and plaintiffs are not precluded from bringing them in this action.

### B. Failure to Exhaust Administrative Remedies

In addition to claim preclusion, defendants contend that plaintiffs' claims should be dismissed for failure to exhaust administrative remedies under the IDEA. *See* 20 U.S.C. § 1415(l). "This requirement is not limited to claims based directly upon violations of the IDEA." *Frazier v. Fairhaven School Committee*, 276 F.3d 52, 59 (1st Cir. 2002). Parties are required to exhaust all administrative procedures "even when the suit is brought pursuant to a different statute so long as the party is seeking relief that is available" under the IDEA. *Frazier*, 276 F.3d at 59 (quoting *Rose v. Yeaw*, 214 F.3d 206, 210 (1st Cir. 2000)). Although exhaustion is the general rule, "[a] plaintiff does not have to exhaust administrative remedies if she can show . . . that the administrative remedies afforded by the process are inadequate given the relief sought." *Frazier*, 276 F.3d at 59 (quoting *Rose*, 214 F.3d at 210-11). Plaintiffs are required to exhaust IDEA administrative procedures even when seeking monetary damages under section 1983. *Frazier*, 276 F.3d at 64.

Here, as noted, plaintiffs could not have brought certain of the claims alleged in Counts Two through Four in the BSEA hearing. Even if plaintiffs could have asserted those claims in the BSEA hearing, they are not based on alleged deficiencies in education. Counts Two and Three are federal constitutional claims and Count Four is a state-law tort claim. They therefore could not be entirely remedied through the IDEA's administrative process. *See Hough v. Shakopee Public Schools*, 608 F. Supp. 2d 1087 (D. Minn. 2009) (finding that Fourth

15

Amendment unlawful search claim did not require exhaustion of administrative procedures because "plaintiffs' assertions with respect to the effect of the searches on their education" were peripheral to the claim); *see also F.H. ex rel. Hall v. Memphis City Schools*, 764 F.3d 638 (6th Cir. 2014) (holding that exhaustion not required when plaintiff brings section 1983 claims predicated on verbal, physical, and sexual abuse); *Tristan v. Socorro Independent School Dist.*, 902 F. Supp. 2d 870, 879-80 (W.D. Tex. 2012) ("[I]t would be absurd to interpret the [IDEA] as placing restrictions on a disabled student seeking redress for constitutional torts, when such restrictions would not apply if the same claims were brought by his non-disabled classmates."); *Deshotel v. West Baton Rouge Parish School Bd.*, 937 F. Supp. 2d 826, 831 (M.D. La. 2011) (holding that exhaustion not required when plaintiffs' claims "are purely federal and state constitutional claims and state tort claims"). Therefore, plaintiffs have not failed to exhaust the IDEA administrative proceedings with respect to the surviving claims.

Defendants also contend that plaintiffs' claims are barred by the IDEA's two-year statute of limitations. The claims, however, are federal constitutional and state-law tort claims that do not arise under the IDEA, and are therefore not subject to the two-year limitation period.

### C. Failure to State a Claim

#### 1. Municipal Liability

Defendants contend that Counts Two through Four should be dismissed as to the Andover School District because the school district is a municipality and plaintiffs have not alleged the requisite elements necessary to state a claim for relief.

Section 1983 is a vehicle for vindicating substantive rights conferred by the Constitution or laws of the United States that have been violated by persons acting under color of state law.

16

*See Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Albright v. Oliver*, 510 U.S. 266, 315 (1994). To establish municipal liability, a plaintiff must show that "the municipality itself causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694-95 (1978). Thus, plaintiffs are required to demonstrate both the existence of a policy or custom and a "direct causal link" between that policy and the alleged constitutional deprivation. *City of Canton*, 489 U.S. at 385; *see also Monell*, 436 U.S. at 694 (policy must be the "moving force [behind] the constitutional violation"); *Santiago v. Fenton*, 891 F.2d 373, 381-82 (1st Cir. 1989). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

Counts Two and Three arise under section 1983; Count Four does not. Count Two merely contains a conclusory allegation that the school district "had a custom, pattern and/or practice of engaging in the misconduct alleged herein by [p]laintiff . . . ." (Am. Compl. ¶ 77). Count Three also contains a conclusory allegation that Bucco "was . . . following [Andover School District] policies and practices" and therefore the school district "is liable for the harm caused E.T. on a theory of municipal liability." (Am. Compl. ¶ 95). The complaint contains no details about this custom or practice, and there are no facts in the complaint to support such an allegation. Although in certain circumstances the single act of an official with final policymaking authority can subject the municipality to liability, the complaint does not allege facts sufficient to give rise to such a finding in this case. *See Harrington v. Almy*, 977 F.2d 37,

17

45 (1st Cir. 1992) (citing *Pembauer v. City of Cincinnati*, 475 U.S. 469, 481-84 (1986) ("[A] single decision can be a policy for *Monell* purposes, if it is made by the official charged with the final responsibility for making it under local law.")). The complaint merely contains a conclusory allegation that the School District had such a policy because "final policymakers adopted or ratified the misconduct at issue." (Am. Compl. ¶ 77). There are no facts alleging who has "final policymaking authority" in the complaint. Therefore, the failure to sufficiently allege a custom or practice is fatal to the claim for damages against the School District. Accordingly, the motion to dismiss Counts Two and Three will be granted as to the Andover School District.

### 2. **Invasion of Privacy**

Count Four alleges a claim against the school defendants for invading E.T.'s privacy by intentionally intruding into his private information by examining and making copies of drawings in his notebook. The Massachusetts Privacy Act establishes "a right against unreasonable, substantial or serious interference with . . . privacy." Mass. Gen. Laws ch. 214 § 1B. Although phrased with the disjunctive "or," a violation must be based on an interference that is both unreasonable and either substantial or serious. *Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 518-22 (1991). The bulk of the cases decided under the statute have concerned the dissemination of allegedly private information about a plaintiff. *See id.* at 517 n.4. However, Massachusetts courts have acknowledged that a claim of unreasonable intrusion upon one's seclusion may be actionable under the statute. *See Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 382 n.16 (2005); *Ellis v. Safety Ins. Co.*, 41 Mass. App. Ct. 630, 638 (1996); *see also Krasnor v. Spaulding Law Office*, 675 F. Supp. 2d 208, 213-14 (D. Mass. 2009) (collecting

cases).

Defendants contend that Count Four fails to state a claim because E.T. brought the notebook to the school, which is a public place, and opened it and drew in it while there. "Generally, whether an intrusion qualifies as unreasonable, as well as either substantial or serious, presents a question of fact." *Polay v. McMahon*, 468 Mass. 379, 383 (2014). "Factors that [courts] have considered in assessing whether there has been an intrusion that is unreasonable, as well as substantial or serious, include the location of the intrusion, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." *Id.* In light of that standard, the issue should be resolved on a full factual record. While there is some question as to whether such a claim will ultimately survive, that is not a reason to dismiss it at this stage. Accordingly, defendants' motion to dismiss Count Four will be denied.

### 3. Illegal Search and Seizure

Finally, defendants contend that Counts Two and Three should be dismissed because plaintiffs did not appeal the suspension. However, the surviving portion of those claims address the alleged violations of plaintiff's Fourth Amendment right to be free from unreasonable search and seizure and First Amendment right of free speech, as claims concerning the suspension and other educational consequences are barred by the doctrine of claim preclusion. The failure to appeal does not affect the surviving claims under Counts Two and Three. Accordingly, defendants' motion to dismiss with respect to Count Two and Three will be denied.

## IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss is

1. GRANTED as to Counts Two, Three, and Four, to the extent that the claims seek relief for the educational consequences of the alleged seizure, or allege discrimination based on disability;

2. GRANTED with respect to the Andover School District as to Counts Two and Three; and

3. otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: March 9, 2015