# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
)
**E.T., a minor, by his parents, JANE DOE,** )
**and JOHN DOE, and on their own behalf,** )
)
   **Plaintiffs,** )
)   **Civil Action No.**
  **v.** )   **14-11892-FDS**
)
**BUREAU OF SPECIAL EDUCATION** )
**APPEALS OF THE DIVISION OF** )
**ADMINISTRATIVE LAW APPEALS,** )
**MASSACHUSETTS DEPARTMENT OF** )
**ELEMENTARY EDUCATION;** )
**ANDOVER SCHOOL DISTRICT;** )
**PATRICK BUCCO, individually and in** )
**his capacity as Principal of** )
**Wood Hill Middle School;** )
**LINDA CROTEAU, individually and in** )
**her capacity as former Special Education** )
**Program Head for Wood Hill Middle School;** )
**MARINEL MCGRATH, Superintendent,** )
**in her official capacity; and** )
**ANNIE GILBERT, School Committee Chair,** )
**in her official capacity,** )
)
   **Defendants.** )
_____)

## MEMORANDUM AND ORDER ON
## MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

  This dispute arises out of an administrative decision by the Massachusetts Bureau of

Special Education Appeals ("BSEA") denying tuition reimbursement under the Individuals with

Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.*, for a student with Asperger's Syndrome.

Plaintiffs E.T. and his parents, proceeding under the pseudonyms Jane Doe and John Doe, have

brought suit against defendants BSEA, the Andover school district, and four school

administrators.[1]  Count One of the amended complaint is an appeal of the BSEA's decision denying tuition reimbursement for E.T.'s attendance at a private school that did not offer special-education services.  Counts Two through Four allege civil rights violations arising from the school administrators' searches and seizures of E.T.'s notebooks that contained comic drawings.

The Court previously dismissed Counts Two through Four against the Andover school district, Count Four against the school administrators in their official capacities, and Count Four against Patrick Bucco.  Accordingly, the remaining claims are an appeal of the BSEA's denial of tuition reimbursement (Count One), a Fourth Amendment claim brought pursuant to 42 U.S.C. § 1983 against Bucco and Croteau (Count Two), a First Amendment claim brought pursuant to 42 U.S.C. § 1983 against the four administrators (Count Three), and a state-law privacy claim against Croteau in her individual capacity (Count Four).

Plaintiffs have moved for summary judgment on Count One.  Defendants have moved for summary judgment on Counts Two through Four.  For the following reasons, plaintiffs' motion will be denied and defendants' motion will be granted.

## I.    Background

### A.    Statutory Background

The Individuals with Disabilities Education Act ("IDEA") conditions the provision of federal funds to public schools on compliance with a requirement to provide all disabled children with a "free appropriate public education" ("FAPE").  *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 987 (1st Cir. 1990) (quoting 20 U.S.C. §§ 1400(c), 1414(b)(2)(A), 1416)).[2]

---

[1] Although the complaint names the "Andover School District," it is unclear whether there is such a separate governmental entity, as opposed to a department of the Town of Andover.  The four administrators are Patrick Bucco, principal of Wood Hill Middle School; Linda Croteau, former special education program head at Wood Hill Middle School; Marinel McGrath, superintendent of the Andover Public Schools; and Annie Gilbert, school committee chair.

"Substantively, the 'free appropriate public education' ordained by the Act requires participating states to provide, at public expense, instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'" *Id.* (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 203 (1982)).

### 1.   Individualized Education Programs

The individualized education program ("IEP") is the IDEA's primary means for assuring the provision of a FAPE to disabled children.  IEPs are formulated through the participation of a team that includes the student's parents, at least one of the student's regular education teachers (if any), at least one special-education teacher, a representative of the local education agency, and an individual who can interpret the instructional implications of evaluation results.  *North Reading Sch. Comm. v. BSEA*, 480 F. Supp. 2d 479, 482 n.5 (D. Mass. 2007) (citing 20 U.S.C. § 1414(d)(1)(B)).   "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005); *see also Roland M.*, 910 F.2d at 987.

> There is no mechanical checklist by which an inquiring court can determine the proper content of an IEP; IEPs are by their very nature idiosyncratic.  One thing is clear:  the substance of an IEP must be something different than the normal school curriculum and something more than a generic, one-size-fits-all program for children with special needs.

*Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008) (citations and internal quotation marks omitted).  IEPs must be reviewed annually and revised when necessary. *Roland M.*, 910 F.2d at 988.

---

[2] On December 10, 2015, Congress enacted the Every Student Succeeds Act ("ESSA").  *See* Pub. L. No. 114-95, 129 Stat. 1802 (2015).  Like the No Child Left Behind Act, which the ESSA replaced, the statute is a reauthorization of the Elementary and Secondary Education Act of 1965.  The ESSA also includes minor amendments to the IDEA that are not relevant to this case.

2.    **Appropriateness and Adequacy**

The IDEA requires an "appropriate" education and an "adequate" IEP; it does not require

perfection.

> The IDEA does not promise perfect solutions to the vexing problems posed by the
> existence of learning disabilities in children and adolescents.  The Act sets more
> modest goals:  it emphasizes an appropriate, rather than an ideal, education; it
> requires an adequate, rather than an optimal, IEP.  Appropriateness and adequacy
> are terms of moderation.  It follows that, although an IEP must afford some
> educational benefit to the handicapped child, the benefit conferred need not reach
> the highest attainable level or even the level needed to maximize the child's
> potential.

*Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993) (citing *Rowley*, 458 U.S. at

198; *Roland M.*, 910 F.2d at 992).[3]

> A school system has met this obligation as long as the program that it offers to a
> disabled student is "reasonably calculated" to deliver "educational benefits."  At
> bottom, this obligation is an obligation to provide an adequate and appropriate
> education.  The IDEA does not place school systems under a compulsion to afford
> a disabled child an ideal or an optimal education.

*C.G. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 284 (1st Cir. 2008) (quoting *Rowley*, 458 U.S.

at 207).

Where a state fails to provide a FAPE in a timely manner, the parents of a disabled child

have the right to seek reimbursement where appropriate for private school tuition.  *See*

*Burlington v. Department of Educ.*, 471 U.S. 359, 370 (1985).  The Supreme Court has made

clear, however, that parents who unilaterally change their child's placement without the consent

of state or local school officials "do so at their own financial risk," *see Burlington*, 471 U.S. at

374, and are entitled to reimbursement "*only* if a federal court concludes both that the public

placement violated IDEA and that the private school placement was proper under the Act."

---

[3] Massachusetts had previously adhered to the higher standard of "maximum possible development" before adopting the federal standard of "free appropriate public education," effective January 1, 2002.  *See* Mass. Gen. Laws ch. 71B; *Wanham v. Everett Pub. Sch.*, 550 F. Supp. 2d 152, 157 (D. Mass. 2008).

*Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (emphasis in original).  A school

district that is "unable to furnish a disabled child with a FAPE through a public school

placement" is "responsible for the reasonable costs incident to [a proper] private placement,"

including tuition reimbursement.  *Five Town*, 513 F.3d at 284-85.

### 3.   **Administrative Hearings**

Should the parents of a disabled child or a school district wish to contest an IEP, the

IDEA requires the state to convene an impartial hearing.  20 U.S.C. § 1415(f)(1)(A).  In

Massachusetts, those hearings are conducted by the BSEA in accordance with rules that it has

promulgated pursuant to Massachusetts law.  *See* Mass. Gen. Laws ch. 71B, § 3; 603 Mass. Code

Regs. 28.08(5); *see also Roland M.*, 910 F.2d at 988.  Under Massachusetts law, the BSEA has

jurisdiction to hear disputes

> between and among parents, school districts, private schools and state agencies
> concerning:  (i) any matter relating to the identification, evaluation, education
> program or educational placement of a child with a disability or the provision of a
> free and appropriate public education to the child arising under this chapter and
> regulations promulgated hereunder or under the Individuals with Disabilities Act,
> 20 U.S.C. § 1400 *et seq.*, and its regulations; or (ii) a student's rights under
> Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its
> regulations.

Mass. Gen. Laws. Ch. 71B, § 2A(a).  The BSEA's administrative decision is reviewable in either

state or federal court.  *See* 20 U.S.C. § 1415(i)(2)(A), (i)(2)(C)(iii); *see also Roland M.*, 910 F.2d

at 987-88.  However, before such an action is brought, the party seeking review must exhaust all

administrative procedures under the IDEA.  20 U.S.C. § 1415(l).

To provide stability and consistency in the education of a disabled student during

administrative review, the IDEA's "stay put" provision states that "during the pendency of any

proceedings . . . , unless the State or local educational agency and the parents otherwise agree,

the child shall remain in the then-current educational placement of the child."  20 U.S.C.

§ 1415(j).  Although not defined by the statute, courts have interpreted a student's "then-current educational placement" to mean "(1) typically the placement described in the child's most recently implemented IEP; (2) the operative placement actually functioning at the time . . . when the stay put provision of the IDEA was invoked; and (3) [the placement at the time of] the previously implemented IEP."  *Mackey v. Board of Educ.*, 386 F.3d 158, 163 (2d Cir. 2004) (collecting cases) (citations and internal quotation marks omitted); *see also Gabel ex rel. L.G. v. Board of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 324 (S.D.N.Y. 2005) ("[T]he phrase 'then-current placement' has been found to mean the last agreed upon placement at the moment when the due process proceeding is commenced.").

### B.    Factual Background

The following undisputed facts are drawn from the administrative records of the September 11, 2012 BSEA hearing ("2012 A.R.") and the January 21, 2014 BSEA hearing ("2014 A.R.").

### 1.    The Parties

E.T. is an eighteen-year-old "highly intelligent" student with Asperger's Syndrome. (2014 A.R. 163).  From 2009 to 2012, he attended Wood Hill Middle School in Andover.  (*Id.* at 163-65).  "His eligibility for special education services from Andover is not in dispute."  (*Id.* at 163).

For the relevant time period, the individual defendants were administrators at Wood Hill or in the Andover Public Schools.[4]  Patrick Bucco was the principal of Wood Hill.  (Am. Compl. ¶ 7).  Linda Croteau was the head of special education at the school.  (*Id.* at ¶ 8).  Marinel

---

[4] The Andover school district and the individual defendants will be referred to collectively as "Andover" unless an individual defendant's actions are relevant to one of the claims.

McGrath was the Superintendent of the Andover Public Schools, and Annie Gilbert was the chairperson of the School Committee for Andover.  (*Id.* at ¶¶ 9-10).

### 2.    E.T.'s Educational Background

In 2003, E.T. entered kindergarten in a school district neighboring Andover.  (2014 A.R. 163).  He exhibited "significant behavioral issues," including physical aggression, oppositional behavior, rigidity, and inattention.  (*Id.*).  While in first grade, E.T. was diagnosed with Asperger's Syndrome.  (*Id.*).  That school district developed an IEP that involved occupational therapy and a one-on-one aide.  (*Id.*).  In second grade, E.T. exhibited "several major episodes of physical outbursts to staff and peers, or attempts to flee or hurt himself, all when he was asked to do something [that] he did not want to do."  (*Id.*).

In 2006, E.T. entered the Andover Public Schools in third grade.  (*Id.*).  E.T. "became less physically aggressive," but continued to exhibit behavioral problems "when asked to do something [that] he did not want to do."  (*Id.*).  Between third and fifth grade, E.T. was suspended multiple times for "several incidents of threatening behavior or gestures towards [school] staff and [his] peers."  (*Id.*).

In 2009, E.T. began sixth grade at Wood Hill Middle School in Andover.  (*Id.*).  He frequently drew cartoons instead of doing classwork, and made "loud noises or verbal demands when he was redirected" from drawing.  (*Id.*).  In November 2009, Andover conducted a re-evaluation of E.T.'s IEP.  (*Id.*).  His "performance on both cognitive and achievement testing was all in the average to superior range but his behavior was problematic."  (*Id.*).  Andover developed an IEP for E.T. that "called for full inclusion [in] all classes, with special education or paraprofessional support, and regular access to the school adjustment counselor . . . written

models or examples of completed assignments, as well as communication with [his] parents."
(*Id.* at 164).  E.T.'s parents accepted the new IEP in February 2010.  (*Id.*).

E.T. "continued to struggle in sixth grade with severe inflexibility, aggressive verbal
outbursts, one verbal threat to an adult, violent/inappropriate drawings including those of his
peers, and nine incidents leading to suspensions."  (*Id.*).[5]  He demonstrated himself to be a "very
talented cartoonist," but his drawings "often featured guns or bombs."  (*Id.* at 163).  After
meeting and observing E.T. during the 2009-10 school year, Dr. Jeff Bostic, a child psychologist
employed by Andover, concluded that while E.T. was "not someone [who] is aggressive [or a
threat] to go harm people," he was disconnected socially and did not like adults imposing
requests or expectations on him.  (2012 A.R. 696-97).  In December 2009, after multiple
meetings between Andover administrators, E.T.'s parents, and psychiatrists and psychologists,
Andover recommended that E.T. undergo a 45-day extended evaluation at the North Shore
Education Consortium ("NEC"), a school that supports member districts with special-education
programs.  (2014 A.R. 164).  E.T.'s parents rejected the recommendation.  (*Id.*).

When E.T. entered seventh grade, his behavioral problems "continued and escalated."
(*Id.*).  In December 2010, his parents agreed for E.T. to undergo an extended evaluation at the
Northshore Prep program, an educational program operated by NEC.  (*Id.*).  E.T. attended that
program for about a month and was "very successful," seemingly "motivated by [his] desire to
return to [Wood Hill]."  (*Id.*).  Although E.T. continued to draw cartoons during school, "[t]he
themes of [his] drawings were not inappropriate while he was at Northshore."  (*Id.*).  At the end
of the evaluation period, Northshore Prep recommended a "small, structured, predictable
therapeutic placement with staff trained to understand and manage [E.T.'s] complex profile."
(*Id.*).  Andover offered to permanently place E.T. at Northshore Prep or at the Gifford School, a

---

[5] The record is unclear whether those were in-school or out-of-school suspensions.

private school in Weston that provides special-education services.  (*Id.*).  E.T.'s parents rejected

that offer, and he returned to Wood Hill.  (*Id.* at 165).

In February 2011, Andover conducted a Functional Behavioral Assessment ("FBA") for

E.T. consisting of a "review of past testing, classroom observations, interviews with teachers and

parents, and consultations with the school psychologist and Dr. [ ] Bostic."  (*Id.*).  The FBA

report recommended a behavior plan with, among other things, more consistent and immediate

feedback, communication, and support.  (*Id.*).

In January 2012, while E.T. was in eighth grade, Linda Croteau, the special-education

program head, informed principal Patrick Bucco that an adult had overheard E.T. making a

comment in the cafeteria about a "surprise type of action to alter the school."  (*Id.* at 165; 2012

A.R. 801, 1094-95).  Around that time, E.T. wrote an essay for his language arts class that

discussed conflicts with teachers and "plans to prove the teachers wrong."  (2014 A.R. 165; 2012

A.R. 801).  Croteau and Bucco interpreted the two events to be disturbing and threatening, and

they suspended E.T. while Andover conducted a risk assessment.  (2014 A.R. 165; 2012 A.R.

801, 1098).

As part of the risk assessment, Dr. Bostic conducted interviews with E.T., his mother, and

his teachers.  (2014 A.R. 165-66).  Dr. Bostic concluded that E.T. was a "low risk of harming

himself or others," but noted that E.T.'s disengagement and "violent themes in [his] drawings or

statements" would "tend to further isolate him from peers, even if they do not indicate actual,

imminent risk."  (*Id.* at 166).  Dr. Bostic recommended "a small educational environment where

[E.T.] could learn to develop trust, and where therapeutic interventions could be infused

throughout the school day."  (*Id.*).  On January 27, 2012, E.T.'s parents and Andover entered into

a mediation agreement, stipulating that his parents would consent to Andover sending referrals to

three private schools, including Gifford, to assess E.T.'s suitability for an out-of-district

placement.  (*Id.*).  E.T.'s parents agreed to visit the schools and Andover agreed to fund his

placement into any of the three schools that accepted him.  (*Id.*).

Of the three, Gifford was the only school to accept E.T.  (*Id.*).  E.T. and his parents

visited the school twice, but deemed it inappropriate, in part, because they believed that the

academics were not sufficiently challenging and that the peer group was not appropriate.  (*Id.*).

### 3.      The Notebook Incidents

After his suspension and risk assessment, E.T. returned to Wood Hill.  (*Id.*).

Administrators assigned an assistant to shadow him during the school day to gather behavioral

data, redirect him from drawing objectionable pictures, and monitor safety issues.  (*Id.*; 2012

A.R. 806-07).  E.T. reportedly felt that people were spying on him.  (2014 A.R. 166).

In March 2012, the shadowing assistant asked E.T. to give him his drawing notebook

because he had it "out" during an assembly.  (2012 A.R. 810-11).  When E.T. refused to hand

over the notebook, the assistant sent him to Bucco's office.  (*Id.*).  The complaint alleges that

Bucco asked E.T. for his notebook so that he could look at it, and E.T. "reluctantly" handed it

over.  (Am. Compl. ¶ 78).  Bucco and Croteau retained and reviewed the notebook, and they later

called E.T.'s parents because, according to Croteau, "[t]here were some incidents in the book

that were very graphically violent, and it seemed to be thematically [E.T.] against the school."

(2012 A.R. 811-12).  The notebook contained drawings depicting a battle between "cartoons"

and "teachers," and narration stating that the cartoon character is "threatened by the teachers"

and that he "vanquishes the enemy."  (*Id.* at 308, 813-14).  Another drawing in the notebook

contained a narration stating "[t]he teachers took everything from us.  Let's take all of it back,"

and "[t]hey took our pride, our hope, dignity, and our souls.  They crush us, beat us, and left us

defeated.  Now we have a chance to make things right."  (*Id.* at 335).  On that page, the leader of

the cartoons, a worm-like creature, appoints a human-like character named E.T. to be the new

leader.  (*Id.*).  On the next page, a character states "Let's make this count!!!" while another

character holds two guns during a battle.  (*Id.* at 336).  Another drawing is titled "E.T. vs.

school" and contains multiple guns.  (*Id.* at 353).  Another drawing contains a character stating

"there it is, the place where this war began" next to a drawing titled "Wood Hill . . . LOL",

which depicts a school building and a character standing outside with a gun with the words "To

be cont . . . ."  (*Id.* at 357).

Croteau believed that the pictures described "thoughts that were threatening to the

school."  (*Id.* at 814-15).  As a result, E.T. was suspended.  (*Id.* at 1101).

As E.T. neared the end of middle school, Andover filed a hearing request with the BSEA

on April 12, 2012 to determine whether E.T. required placement in the Gifford School for the

2012-13 school year in order to receive a FAPE.  (2014 A.R. 162, 166).

In May 2012, E.T. brought another drawing notebook to school, this time to his language

arts class.  (2012 A.R. 816).  After the teacher asked E.T. to give her the notebook and he

refused, he was again sent to Bucco's office.  (*Id.*).  Bucco was not present at the time, but

Croteau was.  (*Id.*).  Croteau told E.T. that he needed to give her the notebook, and he again

refused, stating that if he did, the school would suspend him again.  (*Id.*).  E.T. became very

upset.  (*Id.* at 817-18).  The complaint alleges that Croteau called in the school security officer

"to examine E.T.'s drawing book against his will," and that he "found nothing of concern."

(Am. Compl. ¶ 89).  E.T.'s mother arrived to take him home with the notebook after

arrangements were made to provide the school with a copy of it.  (2012 A.R. at 818).  Upon later

review of the notebook, Andover concluded that the cartoons were "more military in nature," but

learned that one drawing stated "there's no problem that can't be solved with a bullet." (*Id.* at 819).

In June 2012, E.T.'s parents obtained a BFA from Dr. Brian Doyle.  He concluded that E.T. "could function in a public school setting because he could maintain passing grades, posed little risk to himself or others, had motivation to remain in public school, and had demonstrated the ability to modify his behavior . . . ." (2014 A.R. 167).

### 4.     BSEA Decision I and Settlement Negotiations

Beginning on August 15, 2012, the BSEA held a three-day hearing on Andover's request to place E.T. in a private out-of-district school. (*Id.* at 161).  E.T.'s parents appeared *pro se*, and evidence was presented by both sides. (*Id.* at 161-62).  The sole issue to be decided was whether Andover had proved that E.T. required placement in the Gifford School in order to receive a FAPE as he began high school in the 2012-13 school year. (*Id.*).  Andover's position was that E.T.'s social-emotional disabilities would prevent him from making meaningful progress in a large, socially complex public high school such as Andover High School. (*Id.*).  It argued that Gifford, the only private day school to accept E.T., would provide a therapeutic setting and enable him to make meaningful educational progress. (*Id.*).  E.T.'s parents contended that Andover had the resources to provide E.T. with the support and services necessary for him to make educational progress, but that school administrators simply refused to develop a plan. (*Id.*).  The hearing officer took the matter under advisement to issue a written decision.

In August and September 2012, the parties engaged in settlement negotiations.  Andover was aware that E.T.'s parents wanted to send him to a private sectarian school that did not offer special-education services. (*Id.* at 146).  Andover did not initially agree to fund that private placement, and instead offered the following placements for the start of the school year until the

BSEA issued its decision:  Andover High School (with certain stipulations that were unacceptable to E.T.'s parents), Gifford, and NEC.  (*Id.*).  E.T.'s parents declined those placements because they did not find any of them appropriate.  (*Id.*).

E.T. began attending the private sectarian school on September 6 at his parents' expense. (*Id.*).  On September 6, counsel for Andover wrote an e-mail to E.T.'s mother notifying her that Andover was "considering entering into a written settlement agreement with [E.T.], reimbursing [him] for private educational services of [his] choosing, with costs being limited to an amount that [was] not yet agreed upon."  (Pl. Mem. Ex. A).  The e-mail concluded "I will contact you shortly by e-mail with a draft agreement setting forth specific terms and conditions."  (*Id.*).  On September 10, counsel for Andover sent E.T.'s parents a "draft agreement for their review." (*Id.*).

The next day, the BSEA issued its decision.  The hearing officer held that E.T. could not receive a FAPE at Andover High School, but further held that Andover had not met its burden of proving that Gifford would provide E.T. with a FAPE.  (2014 A.R. 168-69).  As a result, the hearing officer ordered that "[w]ithin thirty calendar days from the date of [her] decision, the Andover Public Schools shall locate or create a placement designed for highly intelligent students with Asperger's Syndrome or similar disorders, and shall fund [E.T.'s] placement in such program."  (*Id.* at 169).  Both parties appealed the BSEA's decision to the District Court.

Also on September 11, E.T.'s mother notified the BSEA hearing officer of Andover's draft settlement agreement.  (Pl. Mem. Ex. A).  Andover's counsel immediately responded by e-mail, notifying E.T.'s mother that the BSEA record closed on August 17, 2012, and that it was inappropriate to disclose settlement discussions to the hearing officer.  (*Id.*).  The e-mail

concluded "the Andover Public Schools hereby rescinds its offer sent to you yesterday via e-mail." (*Id.*).

On September 21, 2012, ten days after the BSEA issued its decision, Andover sought the permission of E.T.'s parents to refer E.T. to twelve out-of-district placements, not including Gifford and NEC. (2014 A.R. 146). His parents consented to one referral, the Willow Hill School, but refused to allow referrals to Gifford, NEC, or any of the eleven newly proposed schools. (*Id.* at 147). Andover referred E.T.'s application, but Willow Hill "did not deem [E.T.] to be an appropriate candidate for admission." (*Id.*).

On October 1, E.T.'s parents requested a BSEA hearing for an order directing Andover to reimburse them for the expenses that they already incurred for tuition at the private sectarian school, as well as for expenses for the time period up to the District Court's decision on the appeal of the first BSEA decision. (*Id.* at 142).

On October 9, Andover sent a letter to E.T.'s parents notifying them that in light of Willow Hill's decision to deny E.T. admission and their refusal to allow Andover to send the other eleven referrals, Gifford and NEC remained the only available placements. (*Id.* at 147). On October 16, his parents responded that NEC had denied E.T. admission in the past, that Gifford was not appropriate according to the BSEA decision, and that none of the other eleven proposed placements were satisfactory. (*Id.*). Instead, his parents requested that Andover either fund E.T.'s tuition at the private sectarian school or create an appropriate program for him in Andover High School. (*Id.*). On October 18, Andover responded to E.T.'s parents with a letter stating that "it was not possible to create an appropriate program within Andover High School" and continued to offer Gifford, NEC (which, it stated, was likely to accept E.T. if he re-applied), and the other eleven proposed schools previously offered. (*Id.*). His parents responded, stating

14

that the programs offered by Andover "made no sense," that E.T. was doing extremely well in

the private sectarian school, and that E.T. "[did] not need special education at all." (*Id.*).  The

parties continued to recite their respective positions in e-mails and letters through November

2012.  (*Id.*).  Meanwhile, E.T. continued to attend the private sectarian school at his parents'

expense, and his parents did not consent to any further referrals.  (*Id.*).

On November 21, 2013, after E.T.'s parents had filed their BSEA hearing request for

reimbursement but before the hearing took place, Judge Woodlock issued a ruling on the parties'

cross-motions for summary judgment, fully affirming the BSEA's first decision.  *See Andover*

*Sch. Comm. v. Bureau of Special Educ. Appeals of Div. of Admin. Law Appeals*, 2013 WL

6147139 (D. Mass. Nov. 21, 2013).

### 5.    BSEA Decision II

Beginning on December 11, 2013, the BSEA held a two-day hearing on plaintiffs'

request for tuition reimbursement.  (2014 A.R. 143).  The two issues presented were:

1. Whether the Andover Public Schools has offered [E.T.] an IEP and placement
   which are reasonably calculated to provide him with a [FAPE] as such is
   defined in [BSEA Decision I] for the period from September 2012 to and
   including the date of the District Court decision in this case, November 21,
   2013.

2. If not, whether the private school in which the parents placed [E.T.] in
   September 2012 is appropriate, such that the parents are entitled to
   reimbursement for the costs of this placement.

(*Id.*).

E.T.'s parents pursued reimbursement under two theories of relief.  First, they contended

that Andover did not timely comply with the BSEA's September 11, 2012 thirty-day order to

"locate or create a placement designed for highly intelligent students with Asperger's Syndrome

and similar disorders, and shall fund [E.T.'s] placement in such program."  (*Id.* at 152).  Second,

they pursued a "self-help" theory, contending that Andover failed to offer E.T. an appropriate program and that the private sectarian school was appropriate.

On January 21, 2014, the hearing officer issued her decision.  Noting that both theories essentially depended on the outcome of the first issue presented—whether Andover timely offered to provide E.T. with a FAPE in accordance with the BSEA's first decision—the hearing officer held that E.T.'s parents were not entitled to reimbursement from Andover for unilaterally placing E.T. at the private sectarian school.  (*Id.* at 152-55).  She also noted that the BSEA's first decision "ordered Andover to 'locate or create a placement designed for highly intelligent students with Asperger's Syndrome and similar disorders, and shall fund [E.T.]'s placement in such program.'"  (*Id.* at 152) (quoting 2014 A.R. 170).  The hearing officer concluded that

> In sum, the uncontroverted evidence is that Andover complied with [BSEA Decision I] to the extent possible, and any non-compliance is the result of the parents' failure to cooperate with the referral process.  Within approximately ten days from the date of that decision, Andover had generated a list of twelve potential placements, one or more of which might have proven appropriate for [E.T.]  The next step—consenting to the referrals—was the parents' responsibility.  Additionally, Andover continued to offer placement at the North Shore Consortium, as well as at Gifford.[6]  Andover's inability to move forward in the placement process was solely the result of parents' refusal to allow Andover to do so.  Finally, it is important to note that parents refused to allow any direct contact between Andover and the private school [that E.T. was attending].  While parents' concern about jeopardizing [E.T.'s] current placement are understandable, their refusal to allow direct contact with the private school impeded the process of information-gathering and undercut their claim for public funding of that placement.  Andover cannot reasonably be expected to fund a non-approved private placement without making its own assessment of whether that placement addresses [E.T.'s] special needs.

(*Id.* at 153-54).  In short, the hearing officer held that "Andover fulfilled its responsibility [to offer E.T. a FAPE] by generating a number of potentially appropriate placements as well as

---

[6] As to the Gifford School, the hearing officer stated that "[c]ontrary to the parents' assertions, [BSEA Decision I] did not find that Gifford was inappropriate for [E.T.]; rather, the decision stated that the school had not met its burden of demonstrating its appropriateness.  The school cannot be faulted for presenting Gifford as an option in the face of parents' refusing to allow referrals to other programs."  (2014 A.R. 153 n.4).

keeping the potential placement at Gifford alive when there appeared to be no alternatives as a result of the parents' conduct." (*Id.* at 154).  Although the hearing officer did not need to reach the second question presented—whether the private sectarian school that E.T.'s parents placed him in was appropriate—she concluded that "the private school explicitly declines to implement IEPs or accommodations . . . and provides [E.T.] with no special education or related services, [and] [i]n fact, parents now take the position that [E.T.] does not need special education services." (*Id.* at 155).  Accordingly, the hearing officer denied the parents' request for reimbursement.

### C.      Procedural Background

On April 18, 2014, plaintiffs filed a one-count complaint in this Court, appealing the BSEA's denial of plaintiffs' request for tuition reimbursement.  Plaintiffs amended the complaint on June 16, 2014, to add three additional claims:  (1) a Fourth Amendment § 1983 claim arising out of the March 2012 and May 2012 notebook incidents; (2) a First Amendment § 1983 claim for violation of E.T.'s free speech rights; and (3) a state-law claim for invasion of privacy arising out of the May 2012 incident with Croteau.

On August 6, 2014, defendants moved to dismiss the three newly added counts on a variety of grounds.  The Court held that to the extent that the claims in Counts Two through Four sought relief based on the educational consequences of the seizure, such as E.T.'s suspension or school placement, they were barred by the doctrine of issue preclusion.  To the extent, however, that the new claims sought emotional-distress damages arising out of the alleged Fourth Amendment and First Amendment violations themselves, the Court held that the BSEA did not have jurisdiction to hear those claims, and therefore plaintiffs were not precluded from bringing them in the present action.  The Court dismissed Counts Two and Three against the Andover

school district because the complaint did not allege a plausible claim for relief under a theory of

municipal liability.  Upon defendants' motion for reconsideration, the Court also dismissed

Count Four against the Andover school district, all four administrators in their official capacities,

and Bucco in his individual capacity.

Accordingly, the remaining claims are an appeal of the BSEA's denial of tuition

reimbursement (Count One), a Fourth Amendment claim brought pursuant to § 1983 against

Bucco and Croteau (Count Two), a First Amendment claim brought pursuant to § 1983 against

the four administrators (Count Three), and a claim for violation of the Massachusetts Privacy

Act, Mass. Gen. Laws ch. 214, § 1B, against Croteau in her individual capacity (Count Four).

## II.    Analysis

Plaintiffs have moved for summary judgment on Count One, contending that the BSEA's

decision denying their request for tuition reimbursement should be reversed.  Defendants have

moved for summary judgment on Counts Two through Four.  The Court will address the

administrative appeal before turning to defendants' motion for summary judgment on the civil

rights claims.

### A.    Count One:  Appeal of BSEA's Decision

#### 1.    Legal Standard

Plaintiffs have moved for summary judgment on Count One, their administrative appeal

of the BSEA's decision denying tuition reimbursement.  However, "[i]n a case like this,

summary judgment is merely the device for deciding the issue, because the procedure is in

substance an appeal from an administrative determination, not a summary judgment."  *North

Reading*, 480 F. Supp. 2d at 481 n.1 (citations and internal quotation marks omitted).  The

18

burden of proof rests on the party challenging the BSEA hearing officer's decision. *Hampton*

*Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 54 (1st Cir. 1992).

Essentially, "judicial review [of administrative decisions on claims brought under the

IDEA] falls somewhere between the highly deferential clear-error standard and the non-

deferential *de novo* standard." *Lessard*, 518 F.3d at 24 (citing *Roland M.*, 910 F.2d at 989).  The

IDEA provides that courts reviewing agency decisions "(i) shall receive the records of the

administrative proceeding; (ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court

determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  The Supreme Court has explained that a

district court's review entails both procedural and substantive aspects. *Rowley*, 458 U.S. at 205

("When the elaborate and highly specific procedural safeguards embodied in § 1415 are

contrasted with the general and somewhat imprecise substantive admonitions contained in the

Act, we think that the importance Congress attached to these procedural safeguards cannot be

gainsaid.").  Thus, in reviewing the appropriateness of an IEP, a court "must ask two questions:

'First, has the State complied with the procedures set forth in the Act?  And second, is the

individualized educational program developed through the Act's procedures reasonably

calculated to enable the child to receive educational benefits?'" *Roland M.*, 910 F.2d at 990

(quoting *Rowley*, 458 U.S. at 206-07).

A reviewing court must ensure that the school district and state-education agency adhere

scrupulously to the procedural requirements of the statute and relevant regulations and rules. *See*

*Rowley*, 458 U.S. at 205-06 (noting that the Act "demonstrates the legislative conviction that

adequate compliance with the procedures prescribed would in most cases assure much if not all

of what Congress wished in the way of substantive content in an IEP.").  However, in reviewing

an agency's substantive decisions on FAPEs and IEPs, a reviewing court's "principal function is one of involved oversight." *Roland M.*, 910 F.2d at 989. "[C]ourts should be [loath] to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs." *Id.* at 992; *see also Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004) ("The *Rowley* standard recognizes that courts are ill-equipped to second-guess reasonable choices that school districts have made among appropriate instructional methods."). Nonetheless, it is the reviewing court's role to render "an independent ruling as to the IEP's adequacy based on a preponderance of all the evidence, including the hearing officer's duly weighted findings." *Lenn*, 998 F.2d at 1089.

In short, on matters that implicate educational expertise, heightened deference is due to an agency's administrative findings. *Mr. I v. Maine Sch. Admin. Dist. No. 55*, 416 F. Supp. 2d 147, 156 (D. Me. 2006). However, "when the issue is more a matter of law, the educational expertise of the agency is not implicated, and less deference is required." *Id.* at 157.

As to the evidence, "district courts frequently decide these cases without live testimony, on the basis of the administrative record." *Roland M.*, 910 F.2d at 990. The administrative process is to be accorded "its due weight" such that "judicial review does not become a trial *de novo*, thereby rendering the administrative hearing nugatory." *Id.* at 996. The First Circuit has directed district courts reviewing appeals of administrative decisions under the IDEA to

> review[ ] the administrative record, which may be supplemented by additional evidence from the parties, and make[ ] an independent ruling based on the preponderance of the evidence. That independence is tempered by the requirement that the court give due weight to the hearing officer's findings. This intermediate level of review reflects the concern that courts not substitute their own notions of educational policy for that of the state agency, which has greater expertise in the educational arena.

*Lt. T.B.*, 361 F.3d at 83-84 (citation and internal quotation marks omitted).

20

2.      **Analysis**

The issues before the Court are limited and do not implicate the BSEA's September 2012

substantive FAPE decision, which was affirmed by Judge Woodlock.  Rather, the present appeal

is focused solely on the BSEA's January 2014 decision denying plaintiffs' request for tuition

reimbursement.  The January 2014 decision addressed two issues:  (1) whether Andover timely

offered E.T. a placement and IEP that were reasonably calculated to provide him with a FAPE as

defined in the BSEA's first decision, and (2) if not, whether the private sectarian school was an

appropriate placement in accordance with the BSEA's first decision.  The plaintiffs are entitled

to reimbursement only if the Court answers the first question in the negative and the second

question in the affirmative.

Plaintiffs challenge the BSEA's decision on two grounds.  First, they contend that

Andover failed to provide a FAPE as defined by the BSEA within thirty days of its first decision.

Specifically, they contend that the schools to which Andover offered to provide referrals were

inadequate for a variety of reasons, including their unchallenging academic programs, inadequate

peer groups, and unlikelihood of accepting E.T.  Second, plaintiffs contend that the BSEA

hearing officer improperly excluded evidence that they had reached a settlement agreement with

Andover just days before the BSEA issued its first decision.  Under that settlement agreement,

allegedly reached on the eve of the September 2012 academic year, Andover agreed to fund

E.T.'s placement at the private sectarian school.  E.T.'s parents contend that the settlement

agreement triggered the IDEA's stay-put provision, which would require Andover to fund E.T.'s

then-existing placement for the pendency of the BSEA proceedings.  The Court will address each

argument in turn.

First, the preponderance of the evidence in the two-volume, 780-page administrative

record for the January 2014 hearing supports the BSEA's conclusion that Andover timely

provided plaintiffs with a list of schools that could have potentially provided E.T. with a FAPE.

Furthermore, the BSEA's finding that E.T.'s parents—not Andover—were the cause of delay

also appears to be supported by a preponderance of the evidence.

While the IDEA does not require parents to keep a child in a program that they feel is

inappropriate, "it operates in such a way that parents who *unilaterally change* their child's

placement during the pendency of review proceedings, without the consent of State and local

school officials, do so at their own financial risk." *Burlington*, 471 U.S. at 373-74 (emphasis

added).  "Parents win the gamble if, and to the extent that, the placement they preferred is

ultimately adjudged appropriate and the IEP [proposed by the school]

inappropriate . . . .  Elsewise, the costs arising out of a unilateral placement are not shifted."

*Roland M.*, 910 F.2d at 1000 (citations omitted).  Moreover, because "Congress deliberately

fashioned an interactive process for the development of IEPs," if "parents act unreasonably in the

course of that process, they may be barred from reimbursement under the IDEA."  *Five Town*

*Cmty. Sch. Dist.*, 513 F.3d at 288 (affirming district court's upholding of hearing officer's denial

of parents' reimbursement claim because "parents' single-minded refusal to consider any

placement other than" their preferred choice "disrupted the IEP process, stalling its

consummation and preventing the development of a final IEP"); *see also* 20 U.S.C.

§ 1412(a)(10)(C)(iii)(III) (providing that "[t]he cost of reimbursement . . . may be reduced or

denied . . . upon a judicial finding of unreasonableness with respect to actions taken by the

parents").

Without agreement from Andover, E.T.'s parents unilaterally enrolled him in the private

sectarian school—a school that did not provide any special-education services—on September 6,

2012.  Furthermore, just ten days after the BSEA issued its decision finding that Andover could not provide E.T. with a FAPE at Andover High School and ordering it to "locate or create" an appropriate program within thirty days, Andover sent E.T.'s parents release forms seeking their consent to twelve potential referrals.  That list of twelve schools did not include the previously offered NEC and Gifford referrals, which Andover continued to offer.  Of those fourteen potential programs, E.T.'s parents consented to only a single referral—the Willow Hill School. Andover promptly sent E.T.'s referral information to Willow Hill, but that school denied him admission.  After that, Andover continued to attempt to cooperate with E.T.'s parents in order to place him in one of the remaining thirteen schools before the BSEA's October 21 deadline. However, E.T.'s parents delayed the process by declaring that all thirteen options would "not fit" for E.T., and they steadfastly insisted that Andover fund E.T.'s placement at the private sectarian school.  (2014 A.R. 147, 180).  As the hearing officer concluded, "[b]y refusing to consent to referrals to all but one of the listed programs, [E.T.'s] parents stopped the process in its tracks, and made it impossible for Andover—or themselves—to determine whether any of the listed programs might be appropriate."  (*Id.* at 153).

Although the Court need not decide whether E.T.'s private sectarian school provided E.T. with a FAPE, "there is little or no evidence," as the hearing officer concluded, that would support such a conclusion.  (*Id.* at 155).  Among other things, E.T.'s parents prevented Andover from contacting E.T.'s school directly to determine whether it offered services that would comply with the BSEA's decision.  Furthermore, the hearing officer concluded that E.T.'s private sectarian school "explicitly decline[d] to implement IEPs . . . and provide[d] [E.T.] with no special education or related services."  (*Id.*).  In fact, on October 31, 2012, E.T.'s parents

notified Andover, somewhat curiously, that E.T. "does not need special education at all." (*Id.* at 360). Yet they continued to demand that Andover pay for his tuition.

Plaintiffs' second argument is somewhat more complex. Plaintiffs contend that (1) the BSEA hearing officer incorrectly excluded evidence of a settlement agreement between the parties; (2) the parties did reach a settlement agreement providing that Andover would fund E.T.'s placement at the private sectarian school; and (3) that the settlement agreement re-triggered the IDEA's stay-put provision, making the private sectarian school E.T.'s then-existing placement and entitling plaintiffs to reimbursement. *See* 20 U.S.C. § 1415(j) ("[D]uring the pendency of any proceedings . . . , unless the State or local educational agency and the parents *otherwise agree*, the child shall remain in the then-current educational placement of the child." (emphasis added)). However, the administrative record and additional evidence submitted by plaintiffs demonstrate that the premise of plaintiffs' argument is flawed: the parties did not reach a settlement agreement.

Without deciding whether the hearing officer correctly excluded evidence of the purported settlement agreement from the second BSEA hearing, the Court has reviewed the additional evidence submitted by plaintiffs in accordance with 20 U.S.C. § 1415(i)(2)(C), and concludes that the parties did not reach an agreement.

Between the conclusion of the August 2012 BSEA hearing and the hearing officer's decision on September 11, 2012, the parties attempted to resolve the matter by settlement. The first day of the 2012-13 school year was September 5. As that day approached, Andover became aware that E.T.'s parents intended to enroll him at the private sectarian school. Andover did not consent to fund that placement, and continued to offer three options for E.T.'s placement to begin the school year until the BSEA issued its decision: Andover High School (with certain

conditions), NEC, or Gifford.  Instead, E.T. began to attend the private sectarian school at his parents' expense on September 6.

On September 6, while the BSEA's decision remained pending, Andover's counsel notified E.T.'s parents that they were "*considering* entering into a written settlement agreement" to reimburse plaintiffs for a private placement of their choice and that a "*draft* agreement setting forth specific terms and conditions" would follow.  (Pl. Mem. Ex. A) (emphasis added).  On September 10, Andover's counsel sent E.T.'s parents "a *draft* agreement for their review."  (*Id.*) (emphasis added).

The hearing officer concluded that the parties did not reach a final agreement because it was never signed and because there were no further communications about the agreement after September 10, 2012.  (*See* 2014 A.R. 432-33) (declining to consider the communications about the agreement because "the agreement never happened . . . it's not relevant because you didn't reach it.").  On September 11, 2012, the BSEA issued its decision ordering Andover to create or locate an appropriate program for highly intelligent students with Asperger's Syndrome.  Later that day, Andover's counsel e-mailed E.T.'s mother to rescind the offer, and Andover began to compile potential out-of-district placements so that it could comply with the BSEA's order within thirty days.  (Pl. Mem. Ex. A).

In short, there was no settlement agreement.  Wood Hill Middle School in Andover was E.T.'s then-existing placement when the BSEA proceedings were commenced in April 2012.  *See Gabel*, 368 F. Supp. 2d at 324 ("[T]he phrase 'then-current placement' has been found to mean the last agreed upon placement at the moment when the due process proceeding is commenced.").  Unless the parties "otherwise agree[d]", 20 U.S.C. § 1415(j), plaintiffs were not entitled to reimbursement under the IDEA's stay-put provision.  And although a draft agreement

was circulated before the BSEA's decision, the parties did not reach an agreement before Andover rescinded it.  Thus, Andover remained E.T.'s then-existing placement and plaintiffs are not entitled to reimbursement.

Accordingly, the BSEA's January 2014 decision denying plaintiffs' request for tuition reimbursement will be affirmed and plaintiffs' motion for summary judgment will be denied.

### B.      Counts Two through Four:  Civil Rights and Privacy Claims

#### 1.      Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[ ] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

### 2.        Counts Two and Three:  Civil Rights Claims

In Counts Two and Three, the complaint alleges civil rights claims under 42 U.S.C.

§ 1983 for violations of the First and Fourth Amendments.  Specifically, the complaint alleges in

Count Two that defendants Bucco and Croteau violated E.T.'s right to be free from unreasonable

searches and seizures because they searched and confiscated his notebook in March 2012 and

searched and copied another notebook in May 2012.  In Count Three, the complaint also alleges

that the four administrators violated E.T.'s right to free speech by seizing and punishing him for

his expressive cartoon drawings.

As the Court previously held, to the extent that the civil rights claims seek damages or

other relief based on the educational consequences of E.T.'s drawings, including his suspension

or school placement, they are barred by the doctrine of issue preclusion because plaintiffs did

raise them before the BSEA.  However, to the extent that E.T.'s claims seek emotional-distress

damages arising out of the alleged First Amendment and Fourth Amendment violations

themselves, the BSEA did not have jurisdiction to hear them, and therefore, plaintiffs are not

precluded from bringing them in the present action.[7]

Section 1983 "creates a private right of action for redressing abridgements or

deprivations of federal constitutional rights." *McIntosh v. Antonino*, 71 F.3d 29, 33 (1st Cir.

1995).  "A claim under § 1983 has two essential elements:  the defendant must have acted under

color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the

Constitution or by federal law." *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008)

(internal quotation marks omitted).  Here, it is not disputed that defendants, as public school

administrators, are state actors being sued for actions taken pursuant to their official duties.

---

[7] As to Counts Two through Four, E.T. is the sole named plaintiff; however, for the sake of simplicity and
consistency, the Court will continue to refer to "plaintiffs" collectively.

Accordingly, the sole issue is whether their actions deprived E.T. of his constitutional rights under the First Amendment and Fourth Amendment.

Federal and state officers sued under § 1983 enjoy qualified immunity "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, —— U.S. ——, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Stamps v. Town of Framingham*, —— F.3d ——, 2016 WL 457153, at *4 (1st Cir. Feb. 5, 2016) (quoting *Mullenix*, 136 S. Ct. at 308).

### a.    Count Two:  Fourth Amendment Claim

Plaintiffs contend that in March 2012 and again in May 2012 Bucco and Croteau subjected E.T. to unreasonable searches and seizures of his notebooks in violation of the Fourth Amendment.  Fourth Amendment claims require courts to consider two issues.  First, a court must determine whether there was a search or seizure that implicates the plaintiff's Fourth Amendment rights at all—that is, whether the plaintiff had a reasonable expectation of privacy in the place searched or the item seized.  *See United States v. Symonevich*, 688 F.3d 12, 19 (1st Cir. 2012) ("The Fourth Amendment's protection against unreasonable searches may only be claimed where a [person] demonstrates that he or she personally has a reasonable expectation of privacy in the place searched.").  Second, if a court concludes that there was a search or seizure that triggers the Fourth Amendment's protections, it must determine whether the search or seizure was reasonable.  *United States v. Knights*, 534 U.S. 112, 118 (2001) ("The touchstone of the Fourth Amendment is reasonableness . . . .").

Students in public schools have a constitutional right under the Fourth and Fourteenth

Amendments to be free from unreasonable searches and seizures while on school premises. *New Jersey v. T.L.O.*, 469 U.S. 325, 334-37 (1985). Nonetheless, the "accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the [normal] requirement that searches be based on probable cause"; rather, the legality of school searches depends upon the "reasonableness, under all the circumstances, of the search." *Id.* at 341; *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995) ( "Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children.").

A search and seizure of a student or his property must be "justified at its inception" and must be "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341.

> Under ordinary circumstances, a search of a student by a teacher or other school official will be justified "at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonable related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341-42 (footnotes omitted); *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009). ("The lesser standard for school searches could as readily be described as a moderate chance of finding evidence of wrongdoing.").

Several courts have addressed Fourth Amendment claims arising out of school searches of a student's property because of violent drawings or writings, and have concluded that school administrators acted reasonably. *See Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 621-23

(5th Cir. 2004) (affirming summary judgment for school on plaintiff-student's Fourth
Amendment claim because search was reasonably justified by his violent drawing even though
the student's younger brother—not plaintiff—brought the two-year-old drawing to school);
*Cuesta v. School Bd. of Miami-Dade Cty.*, 285 F.3d 962, 965-69 (11th Cir. 2002) (finding that
student's violent drawings accompanied by threatening words aimed at the school was sufficient
to create reasonable suspicion that the a student may have intended to harm the school); *K.J. v.
Greater Egg Harbor Reg'l High Sch. Dist. Bd. of Educ.*, 2015 WL 5039460, at *11-13 (D.N.J.
Aug. 26, 2015) (dismissing Fourth Amendment claim brought by student with Asperger's
Syndrome against vice principal for searching student's sketchpad that contained violent
drawings, in part, because teacher "reported her concern about [his] drawings" before search was
initiated); *see also D.F. ex rel. Finkle v. Board of Educ. of Syosset Cent. Sch. Dist.*, 386 F. Supp.
2d 119, 128 (E.D.N.Y. 2005), *aff'd sub nom. D.F. v. Board of Educ. of Syosset Cent. Sch. Dist.*,
180 F. App'x 232 (2d Cir. 2006) (granting defendant's motion to dismiss Fourth Amendment
claim for seizing student for psychological testing because student's written "story, with its
graphic depictions of a child brutally murdering his classmates, gave defendants reasonable
grounds for fearing that plaintiff might carry out the acts he described"); *Matos ex rel. Matos v.
Clinton Sch. Dist.*, 350 F. Supp. 2d 303, 307 (D. Mass. 2003), *aff'd*, 367 F.3d 68 (1st Cir. 2004)
(denying preliminary injunction and finding that student's Fourth Amendment claim was
unlikely to succeed on merits because it "was reasonable for the teacher to believe, once
[student] refused to show her the paper, that [student] had violated a school policy"); *Williams v.
Cambridge Bd. of Educ.*, 186 F. Supp. 2d 808, 815-16 (S.D. Ohio 2002) (finding probable cause
for detention of students who had discussed bringing guns and bombs to school in the wake of
the Columbine massacre when several classmates reported these statements to school officials);

*Stockton v. City of Freeport*, 147 F. Supp. 2d 642, 646 (S.D. Tex. 2001) (finding that discovery

of threatening letter on school property justified detention of suspected students, and noting that

"officials in the Columbine massacre were harshly criticized for *failing* to take action regarding

prior signs of problems" (emphasis in original)).

Assuming that E.T. had a reasonable expectation of privacy in his drawings, the search

and seizure of his notebook in March 2012 was reasonable under the circumstances. Beginning

with the justification for the search at its inception, E.T. exhibited many behavioral issues—

including outbursts toward teachers, disengagement, and isolation—that concerned school

administrators. Despite the fact that Dr. Bostic concluded that E.T. was likely not a threat to

others, when he entered middle school at Wood Hill his drawings "often featured guns or

bombs." He wrote and submitted an essay about conflicts with teachers and his desire to prove

something to them. While those events could be construed as innocuous, school administrators,

who had significant insight into E.T.'s psyche from his FBA's and extended evaluation at NEC,

reasonably interpreted them to be disturbing and threatening to the school. Their concerns led

them to assign an assistant to shadow E.T. throughout the school day, in part, to monitor safety

issues. When that assistant saw E.T. drawing in his notebook at an inappropriate time, he asked

to see the drawings, but E.T. refused. That refusal, under the circumstances, could reasonably

cause a teacher concern. Thus, when the assistant sent E.T. to the principal's office, Bucco had

"reasonable grounds for suspecting that the search [would] turn up evidence that the student

ha[d] violated or [was] violating . . . the rules of the school"—specifically, that his drawings

constituted threats to school safety. *T.L.O.*, 469 U.S. at 342. Therefore, the search and seizure of

E.T.'s notebook in March 2012 were justified at their inception.

Moreover, the search was also reasonable in scope and not overly intrusive under the

circumstances.  Bucco searched only the notebook in question that was the cause of his concern; he did not search E.T.'s locker or other belongings.  And the search took place in the privacy of Bucco's office, thereby limiting the intrusion.  *See K.J.*, 2015 WL 5039460, at *12 (noting the fact that "encounter took place in the privacy of [vice principal's] office with [student] present . . . limit[ed] the intrusion").

Accordingly, the search and seizure of E.T.'s notebook in March 2012 did not violate the Fourth Amendment because, under the circumstances—including E.T.'s behavioral issues and past actions that could be reasonably interpreted as disturbing and threatening—they were justified at their inception and reasonably limited in scope.

The second search and seizure of E.T.'s notebook in May 2012 was equally, if not more, reasonable.  In the wake of his suspension for drawings depicting a violent battle involving guns against teachers and the school, E.T. again brought a drawing notebook to class.  When the teacher asked to see it and E.T. refused, the teacher sent him to the principal's office.  When Croteau asked him for the notebook, E.T. again refused, stating that if he gave it to her he would be suspended again.  In that context, and given E.T.'s past behavioral issues and violent drawings, Croteau had reasonable grounds to suspect that a search of the notebook would produce evidence that E.T. was violating school rules.  Thus, the search was justified at its inception.  Moreover, the search was again limited to the notebook.  Accordingly, the search of E.T.'s notebook in May 2012 was reasonable under the circumstances.

Because the undisputed facts demonstrate that the searches and seizures of E.T.'s notebooks by defendants were reasonable at their inception and were conducted in a reasonable

manner when balanced against the school's interest in ensuring the safety and welfare of students, defendants are entitled to summary judgment on Count Two.[8]

### b.    Count Three:  First Amendment Claim

The first step in addressing a First Amendment claim is determining whether the plaintiff's speech is protected at all.  The second step is determining whether, based on the type of speech and the specific circumstances of the speech restriction, the restriction was reasonable or whether it infringed the First Amendment rights of the speaker.

As to the first step, it is well-established that "true threats" are not protected by the First Amendment.  *See Watts v. United States*, 394 U.S. 705, 708 (1969).  Some courts to address First Amendment challenges to school-imposed discipline for a student's violent drawings and writings have held that the speech was a true threat and thus stopped at the first step.  *See, e.g.*, *Lovell ex rel. Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 372 (9th Cir. 1996) (finding that student saying to teacher "If you don't give me this schedule change, I'm going to shoot you" was "unequivocal and specific enough to convey a true threat of physical violence" and thus was not protected by the First Amendment at all).

However, most courts to address violent student essays or drawings have avoided the inherently ambiguous first issue and proceeded directly to the second issue:  whether the school's response to the potentially violent speech violated the First Amendment.  *See LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 991 n.5 (9th Cir. 2001) (citing *Lovell* but concluding "because we

---

[8] In the alternative, the defendants' actions are certainly protected by qualified immunity.  Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law."  *Solis-Alarcon v. United States*, 662 F.3d 577, 581 (1st Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (internal quotation marks omitted)).  The doctrine of qualified immunity recognizes that "reasonable mistakes can be made as to the legal constraints on particular . . . conduct."  *Saucier v. Katz*, 533 U.S. 194, 205 (2001).  Here, it was reasonable for Bucco and Croteau to believe that the searches of E.T.'s notebooks were justified by his behavioral history and the potential threat to school safety.  Accordingly, even if defendants' actions did violate E.T.'s Fourth Amendment rights, they are protected by qualified immunity.

conclude that even if the poem was protected speech, the school's actions were justified, we need

not resolve [the true-threat] issue"); *see also Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d

109, 118 (2d Cir. 2012) (Pooler, J., dissenting) (referring to the majority's reluctance to address

the true-threat issue but noting that "even an empty threat in the classroom might do just as much

harm as a true one made outside the schoolhouse gate"). Here, Andover does not appear to

contend that E.T.'s cartoon drawings are true threats that are not protected by the First

Amendment. Accordingly, the Court will assume that E.T.'s speech was protected and proceed

directly to the second issue: whether Andover's actions violated E.T.'s free speech rights.[9]

It is well-established that students in public schools are protected by the First

Amendment and do not "shed their constitutional rights to freedom of speech or expression at the

schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

Nonetheless, "the First Amendment rights of students in the public schools are not automatically

coextensive with the rights of adults in other settings, and must be applied in light of the special

characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260,

266 (1988) (citation and internal quotation marks omitted).

In deciding whether school officials have infringed a student's First Amendment rights, a

court must first determine what type of speech is at issue. There are "three distinct areas of

student speech, each of which is governed by different Supreme Court precedent." *LaVine*, 257

F.3d at 984 (internal quotation marks omitted).

> School officials have the authority to limit, restrict or punish: (1) speech that
> causes a substantial and material disruption of the school's operation, or which
> impinges upon the rights of other students, *Tinker*, 393 U.S. at 508, (upholding
> high school students' right to wear black armbands in protest against the Vietnam
> War); (2) vulgar or lewd speech, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S.

---

[9] Again, to the extent that they can be separated, the Court addresses only E.T.'s emotional distress or
related effects of the alleged First Amendment violation, not Andover's decision to suspend him or any other
educational consequences.

> 675, 683 (1986) (holding school could punish students for making lewd remarks
> at school assembly); and (3) school-sponsored speech that is limited to legitimate
> educational concerns. *Hazelwood*, 484 U.S. at 273 (holding that school principal
> could censor student newspaper).

*Demers ex rel. Demers v. Leominster Sch. Dep't*, 263 F. Supp. 2d 195, 201 (D. Mass. 2003).[10]

A student's violent drawing is not school-sponsored speech controlled by *Hazelwood*, nor

is it necessarily vulgar speech controlled by *Bethel*. Accordingly, most courts to address First

Amendment challenges to school-imposed discipline for violent drawings or writings have

employed the *Tinker* standard. *See Cuff*, 677 F.3d at 112-13; *Boim*, 494 F.3d at 983; *LaVine*, 257

F.3d at 989-91. Under *Tinker*, student speech may be curtailed if the speech will "materially and

substantially interfere with the requirements of appropriate discipline in the operation of the

school." *Tinker*, 393 U.S. at 509 (internal quotation marks omitted). School administrators may

limit student speech to prevent material disruption in schools when they have more than an

"undifferentiated fear or apprehension of disturbance" and can demonstrate that their actions

were "caused by something more than a mere desire to avoid the discomfort and unpleasantness

that always accompany an unpopular viewpoint." *Id.* at 508-09.

In applying *Tinker*, courts have held that "the relevant inquiry is whether the record

demonstrates facts which might reasonably have led school authorities to forecast substantial

---

[10] The First Circuit "has not ruled on the factually specific issue of whether a student's violent drawings are constitutionally protected speech." *Demers*, 263 F. Supp. 2d at 201 (granting school district's motion for summary judgment on student's First Amendment claim for suspension relating to his drawing of school and teacher surrounded by explosives and guns, and concluding that school district's actions were "reasonable and did not violate [his] First Amendment rights."). Moreover, unlike other circuits, the First Circuit has not addressed a case involving student speech that is similar to drawings, such as violent essays or poems. *See, e.g., Cuff*, 677 F.3d at 109 (affirming district court's finding that student's suspension for writing that his wish was "to blow up the school with the teachers in it" did not violate the First Amendment); *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765 (5th Cir. 2007) (holding that student's violent written story depicting a school shooting was not constitutionally protected despite student's claim that he meant it as a work of fiction); *Boim v. Fulton Cty. Sch. Dist.*, 494 F.3d 978, 982 (11th Cir. 2007) (upholding suspension for student's narrative describing a "Columbine shooting attack"); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001) (reversing district court's finding that student's expulsion for violent poem violated the First Amendment).

disruption of or material interference with school activities." *Cuff*, 677 F.3d at 113 (internal

quotation marks, omissions, and alterations omitted).  As the Second Circuit has explained:

> This test does not require school administrators to prove that actual disruption
> occurred or that substantial disruption was inevitable.  Rather, the question is
> whether school officials might reasonably portend disruption from the student
> expression at issue. . . .  [A]n actual disruption standard would be absurd.  The
> test is an objective one, focusing on the reasonableness of the school
> administration's response, not on the intent of the student.

*Id.* (citations and internal quotation marks omitted); *see also LaVine*, 257 F.3d at 989 (noting that

"*Tinker* does not require school officials to wait until disruption actually occurs before they may

act.  In fact, they have a duty to prevent the occurrence of disturbances," and emphasizing that

*Tinker* requires only the "existence of facts which might reasonably lead school officials to

forecast substantial disruption" (citations and internal quotation marks omitted)).  Courts "look

to the totality of the relevant facts" including "not only to [the student's actions], but to all of the

circumstances confronting the school officials that might reasonably portend disruption."

*LaVine*, 257 F.3d at 989.  Before turning to the application of the *Tinker* standard to the situation

presented here, two explanations of cases with similar facts are helpful.

      In *LaVine*, a high school student was expelled in connection with a violent poem that he

showed a teacher.  257 F.3d at 983-84.  The district court overturned the expulsion.  *Id.* at 986-

87.  Reversing the district court, the Ninth Circuit applied the *Tinker* standard and held that the

school district did not violate the student's First Amendment rights.  *Id.* at 989.  In applying

*Tinker*, the court considered the totality of facts, including the student's previous suicidal

ideations, domestic issues, and prior school disciplinary issues, and "given the backdrop of actual

school shootings," held that school officials reasonably could have "forecast" substantial

disruption or material interference with school activities, although none occurred.  *Id.* at 989-90.

The court concluded:

> At its extreme [the poem] can be interpreted as a portent of future violence, of the shooting of [the student's] fellow students.  Even in its most mild interpretation, the poem appears to be a cry for help from a troubled teenager contemplating suicide.  Taken together and given the backdrop of actual school shootings, we hold that these circumstances were sufficient to have led school authorities reasonably to forecast substantial disruption of or material interference with school activities—specifically, that [the student] was intending to inflict injury upon himself or others.

*Id.* at 990.

In *Cuff*, a school suspended a fourth-grade student for an in-school drawing.  677 F.3d at 111.  The student's teacher instructed the class to fill in a picture of an astronaut and write things in various sections of the astronaut.  *Id.*  The student wrote in the "wish" section "blow up the school with the teachers in it."  *Id.*  The school suspended the student for five days.  *Id.* at 112.  The Second Circuit affirmed the district court's grant of summary judgment for the school district, despite the fact that the student later told school officials that "he did not mean what he had written in the astronaut drawing and that he was only kidding."  *Id.*

The court prefaced its findings by noting that "in the context of student speech favoring violent conduct, it is not for courts to determine how school officials should respond," because "[s]chool administrators are in the best position to assess the potential for harm and act accordingly."  *Id.* at 114 (citations and internal quotation marks omitted).  It held that based on the totality of the circumstances, "it was reasonably foreseeable that the astronaut drawing could create a substantial disruption at the school."  *Id.*  The court noted that the student "had a history of disciplinary issues, and his other earlier drawings and writings had also embraced violence."  *Id.* at 113-14.  The court also noted that the student showed his drawing to other students.  *Id.* at 114.  It concluded that the school officials "could reasonably have concluded that [the student's] astronaut drawing would substantially disrupt the school environment" in a number of ways, including the possibility that other students would follow the student's example; the possibility

that other students would be scared; the possibility that parents would lose confidence in school

safety; the possibility that enrollment would decline, or the possibility that the school would need

to hire security personnel.  *Id.* at 114-15.  Finally, as the Second Circuit noted, many "[c]ourts

have allowed wide leeway to school administrators disciplining students for writings or other

conduct threatening violence."  *Id.* at 114.[11]

Applying that standard here, based on the totality of the circumstances, it was reasonable

for defendants to conclude that E.T.'s drawings had the potential to substantially disrupt the

school environment.  Beginning in kindergarten, E.T. exhibited significant behavioral issues,

including physical aggression, attempts to hurt himself, and oppositional behavior.  He was

suspended multiple times in elementary school for threatening behavior or gestures towards staff

and peers.  Although he became less physically aggressive in middle school, he continued to be

disconnected socially, drew cartoons involving guns or bombs, exhibited resistance when adults

imposed expectations on him, and made a verbal threat to an adult.  Around January 2011, he

wrote an essay about conflicts with teachers and plans to prove the teachers wrong.

Administrators, including Bucco and Croteau, interpreted his behavior and comments to be

disturbing and threatening.

In light of E.T.'s behavioral history and his essay, the drawings were, to say the least,

---

[11] *See also Boim,* 494 F.3d at 981 (finding that school officials did not violate a student's First Amendment rights when they suspended her for writing a narrative depicting her shooting her math teacher); *Ponce*, 508 F.3d at 772 (analyzing a student's speech threatening a "Columbine shooting attack" on a school, and finding that "such specific threatening speech to a school or its population is unprotected by the First Amendment" because "[s]chool administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance"); *DC v. Valley Cent. Sch. Dist.*, 2013 WL 2181213 (S.D.N.Y. May 20, 2013) (granting school district's motion for summary judgment and concluding that in context of student's history of incidents and confrontations at school, it was reasonable for administrators to believe that student's violent rap lyrics that he brought to school would cause a substantial disruption); *Demers*, 263 F. Supp. 2d at 203 (considering school's suspension of an eighth grader for his drawing of guns and explosives and concluding "[i]t would have been unthinkable for the [ ] school officials not to have taken any action in this case.  Given the difficulty in balancing safety concerns and free expression, I conclude that their actions were reasonable and did not violate [the student's] First Amendment rights").

concerning.  They portray an "epic" battle involving guns against teachers at Wood Hill, where

the "final battle" was "win or die."  It was perfectly reasonable for Bucco and Croteau to

conclude that E.T.'s drawings, whether they were explicitly shared with another student or not,

would cause disruption in the school.  Indeed, from the perspective of a parent of another student

at the school, "[i]t would have been unthinkable for the [Wood Hill] officials not to have taken

any action in this case."  *Demers*, 263 F. Supp. 2d at 203.  Accordingly, E.T.'s suspension and

any other educational or emotional effects arising out of it, did not violate the First Amendment,

and defendants are entitled to summary judgment on Count Three.[12]

### 3.     Count Four:  Privacy Claim

Count Four of the amended complaint alleges that Croteau's May 2012 search of the

notebook was an "invasion of privacy by intrusion upon [E.T.'s] seclusion."  (Am. Compl.

¶¶ 97-104).  The Massachusetts Privacy Act, Mass. Gen. Laws ch. 214, § 1B, provides, in

relevant part, "a person shall have a right against unreasonable, substantial or serious

interference with his privacy."  "Most of [the SJC's] jurisprudence under that statute has

involved public disclosure of private facts, but a plaintiff also may support a claim of invasion of

privacy by showing that a defendant has intruded unreasonably upon the plaintiff's 'solitude' or

'seclusion.'"  *Polay v. McMahon*, 468 Mass. 379, 382 (2014).

Notwithstanding the statute's use of the disjunctive term "or," courts interpreting the

statute have determined that "[t]he intrusion must be both unreasonable and [either] substantial

or serious."  *Walker v. Jackson*, 952 F. Supp. 2d 343, 353 (D. Mass. 2013).  The Privacy Act

"was not intended to prohibit serious or substantial interferences which are reasonable or

---

[12] In the alternative, the defendants are protected by qualified immunity.  It was reasonable for Bucco, Croteau, McGrath, and Gilbert to believe that, based on E.T.'s behavioral history, his cartoon drawings would likely cause a substantial disruption in the school.  Accordingly, even if defendants' actions did violate E.T.'s First Amendment rights, they are protected by qualified immunity.

justified.  For example, the statute would not apply to a search and seizure—clearly a serious and substantial interference with privacy—when it is performed pursuant to constitutional requirements and is otherwise reasonable." *Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 518 (1991).  "Whether an intrusion qualifies as unreasonable, as well as either substantial or serious, presents a question of fact." *Polay*, 468 Mass. at 383.  Factors to be considered in assessing whether there has been an intrusion that is unreasonable and substantial or serious, include "the location of the intrusion, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." *Id.*

As discussed above, Croteau's May 2012 search and seizure of E.T.'s notebook was "performed pursuant to constitutional requirements and [was] otherwise reasonable," *Schlesinger*, 409 Mass. at 518, given the need for school administrators to maintain order and safety.  *See T.L.O.*, 469 U.S. at 341 ("[A]ccommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause.").  Moreover, the "underlying purpose behind the intrusion," *Polay*, 468 Mass. at 383, was to ensure school safety.  Croteau conducted the search in light of E.T.'s past behavioral issues, his essay about proving teachers wrong, and his violent drawings obtained by Andover in the March 2012 search.  Moreover, E.T. brought the notebook to school—a public place—and, whether or not teachers or other students saw the cartoons, he was using it in plain sight of his peers and supervisors.

Accordingly, Croteau is entitled to summary judgment on Count Four.  The undisputed facts demonstrate that her search of E.T.'s notebook in May 2012 was not sufficiently

unreasonable and substantial or serious to constitute a violation of E.T.'s privacy rights under Mass. Gen. Laws ch. 214, § 1B.

**III.**     **Conclusion**

For the foregoing reasons, plaintiffs' motion for summary judgment on Count One is DENIED, and defendants' motion for summary judgment on Counts Two through Four is GRANTED.

**So Ordered.**

                                                /s/ F. Dennis Saylor
                                                F. Dennis Saylor IV
Dated: March 11, 2016                           United States District Judge